UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DANDRA BROWN,[1]

                      Plaintiff,

     - against -

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
18-CV-1994 (RRM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

Plaintiff Dandra Brown brings this action against the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the Commissioner's determination that he was not disabled and, therefore, not eligible for Supplemental Security Income ("SSI") between December 25, 2013, and November 19, 2016.  Brown and the Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Pl.'s Mot. (Doc. No. 14); Def.'s Mot. (Doc. No. 16).)  For the reasons set forth below, the Commissioner's motion is denied, and Brown's motion is granted to the extent that it requests that this matter be remanded to the Commissioner for further proceedings.

## BACKGROUND

The following facts are drawn from the parties' joint stipulation of facts.  (Doc. No. 23.)  Brown was born on November 21, 1966.  (Tr. 85.)[2]  He did not complete high school but obtained a GED in 1995.  (Tr. 297.)  In the late 90s and early 2000's, he held a variety of jobs,

---

[1] Brown's motion for judgment on the pleadings indicates that Brown's first name is D'Andre, not Dandra.  The Court refers to plaintiff as Dandra Brown because that name appears in the complaint, (Doc. No. 1), and throughout the Administrative Transcript, (Doc. No. 20).

[2] Numbers preceded by "Tr." denote pages in the Administrative Transcript.

including customer service, laborer, and security. (*Id.*) In 2006, however, he was convicted of a crime and was incarcerated until September 2013. (Tr. 47–48, 296.) Following his release, he worked "'off the books,' doing construction, cleaning buildings, and unloading trucks." (Tr. 46–48, 355.)

In December 2013, Brown began to experience an ache and tightness in his chest. (Tr. 304.) On December 18, 2013, he underwent a physical examination at Brooklyn Hospital Center clinic ("BHC"), where he reported a history of hypertension and left knee pain. (Tr. 485.) Although he was not in acute distress, he had an irregular heartbeat. (*Id.*)

Over the next few days, Brown experienced lightheadedness, shortness of breath, and nausea. (Tr. 375.) On December 22, he returned to BHC and reported experiencing shortness of breath (or dyspnea), which he attributed to a chest cold. (Tr. 385, 467–74.) Upon examination, the doctor again detected an irregular heartbeat and recommended hospitalization. (Tr. 385.) Brown refused to be admitted, preferring to wait until after the holidays. (*Id.*) However, when he returned to BHC on December 27, he not only had an irregular heartbeat but also had tachycardia – a condition in which the heart beats faster than normal while at rest. (Tr. 387.)

Brown was admitted Brown was admitted to Brooklyn Hospital and, over the next four days, underwent a battery of tests. (Tr. 370–84.) He had an electrocardiogram (ECG or EKG), which established that he had atrial fibrillation ("AFib") with rapid ventricular rate ("RVR"), premature ventricular contractions ("PVCs"), and nonspecific ST-wave changes ("NSSTs"). (Tr. 375.)[3] He had an echocardiogram which showed mild left ventricular hypertrophy, a mildly dilated left ventricle ("LV"), moderately impaired LV systolic function, and an ejection fraction

---

[3] During atrial fibrillation, the heart's two upper chambers (the atria) beat chaotically and irregularly, out of sync with the heart's two lower chambers (the ventricles). *See* https:www.mayoclinic.org/diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624. Symptoms of AFib often include heart palpitations, shortness of breath, and weakness. *Id.* The term, "nonspecific ST-wave abnormalities," is frequently used when the clinical data are not available to correlate with the ECG findings, as such abnormalities may be associated with a number of conditions. Https://ecg.utah.edu/lesson/10.

("EF") between 35 and 40%.  (Tr. 420–21.)[4]  That same test showed a mildly dilated left atrium, and mild-to-moderate mitral and tricuspid regurgitation.  (*Id.*)  Brown also had a left heart catheterization, which established that he had non-obstructive coronary artery disease ("CAD") and moderate LV dysfunction.  (Tr. 371.)

Based on these tests, Brown was diagnosed with Afib, hypertension, cardiomyopathy, and was discharged from the hospital on December 30, 2013.  (Tr. 375.)[5]  He was prescribed Coumadin (a/k/a Warfarin), a blood-thinner used to prevent clots.  (Tr. 371, 383.)

Medical Records for 2014

On February 4, 2014, Brown returned to BHC, complaining that a persistent cough was interrupting his sleep.  (Tr. 476–79, 595–604.)  He denied shortness of breath, dizziness, weakness, or paresthesia.  (Tr. 597.)  After an examination showed tachycardia, but otherwise normal heart sounds, the doctor recommended another EKG.  (Tr. 477, 600.)  Brown refused the test, stating that he had not taken his medications that day.  (*Id.*)  The examining physician attributed the shortness of breath to acute bronchitis, not CAD, and prescribed prednisone (a corticosteroid) and an antibiotic.  (Tr. 601.)

On March 19, 2014, Mr. Brown had an intake assessment with internist Eddy Cadet, M.D., at a Federal Rehabilitation Services ("FEDCAP") WeCARE clinic, apparently in connection with an application for Public Assistance.  Brown stated that he had been working in a warehouse until he experienced the lightheadedness, palpitations, and shortness of breath that resulted in his hospitalization.  (Tr. 448.)  In response to a written question inquiring about the

---

[4] The ejection fraction, which is usually measured only in the left ventricle, refers the percentage of blood leaving the heart each time it contracts.  An LV ejection fraction of 55 percent or higher is considered normal, an LV ejection fraction of 50 percent or lower is considered reduced, and an LV ejection fraction between 50 and 55 percent is usually considered "borderline."  Https://www.mayoclinic.org/ejection-fraction/expert-answers/faq-2005828.

[5] Cardiomyopathy is a disease of the heart muscle which makes it harder to pump blood and which can lead to heart failure.  Https://www.mayoclinic.org/diseases-conditions/cardiomyopathy/symptoms-causes/syc-20370709.

medical problems that prevented him from working, Brown wrote: "AFib, hypertension, left knee pain, and back pain." (Tr. 438.) He reported having previously received physical therapy for his knee problem, (*id.*), and said he had difficulty walking and climbing stairs, (Tr. 443). He claimed that he was "facing surgery in the near future," and that he had been advised to find employment other than heavy manual work. (Tr. 446, 448.)

Dr. Cadet performed an examination, which was normal in most respects. While Brown got on and off the examination table easily and exhibited a normal range of motion, doctor detected crepitation – a grating or crackling sound or sensation – in both knees. (Tr. 457.) Dr. Cadet found that Brown was "limited" in lifting, walking, pulling, and kneeling. (Tr. 458.) The doctor opined that since Brown had only performed heavy work, which was precluded by his cardiac condition, "he might not be able to return to gainful work." (Tr. 462–63.)

On April 23, 2014 in late April 2014, Brown filed an application for SSI benefits, alleging an onset date of December 25, 2013. (Tr. 255–75.) In that application, Brown alleged that he was disabled due to AFib with rapid ventricular response, hypertension, left knee pain, back pain, heart disease, and obesity. (*Id.*)

On May 8, 2014, Brown went to BHC for a follow-up visit, at which he asked for refills of all of his medications and to have disability questionnaires filled out. (Tr. 488–96, 605–17.) He reported shortness of breath after walking 2 to 3 blocks, palpitations "on and off," and lightheadedness and nausea with exertion. (Tr. 490.) On examination, Dr. Poras Patel, an internist, found that Brown, who had not taken his anti-hypertensive medication for a month because he had run out, had very high blood pressure: 170/105. However, the doctor did not detect any cardiac arrhythmia. (Tr. 493–94.) Although the musculoskeletal examination revealed a normal range of motion and no arthralgia, joint swelling, limb pain, myalgia, or stiffness, Dr. Patel credited Brown's claims of back and left knee pain. (Tr. 491–94.) The

4

doctor's notes reflect that Brown was not only taking blood thinners (Coumadin and aspirin) and heart medications – Lisinopril (an ACE inhibitor) and Metoprolol (a beta-blocker) – but was also taking Voltaren – a nonsteroidal anti-inflammatory medication ("NSAID") prescribed for mild to moderate pain.  (Tr. 492.)

On May 19, 2014, Brown returned to BHC for a follow-up visit and saw Swapna Katikaneni, M.D., an internist and cardiology clinic resident.  (Tr. 503–16, 618–32.)  He reported having palpitations and chest tightness "on and off" and said, that for the preceding 5 months, he had experienced shortness of breath after walking 3 blocks.  (Tr. 503.)  He denied experiencing orthopnea (shortness of breath when lying flat), chest pain, or paroxysmal nocturnal dyspnea (shortness of breath and coughing occurring at night), and denied gait disturbance, loss of sensation, weakness, arthralgia, back pain, or joint swelling.  (Tr. 505.)  On examination, Dr. Katikaneni did not detect any irregularities in Brown's heart rate or rhythm but measured his blood pressure at 160/100.  (*Id.*)  Brown admitted that he had not been taking his blood pressure medication due to insurance problems.  (Tr. 516.)

The next day, Brown had a transthoracic echocardiogram.  (Tr. 533, 572.)  That testing revealed a severely depressed EF of 35%, a dilated left atrium, concentric LV hypertrophy, and global hypokinesis (decreased movement). (Tr. 533.)  Dr. Ronny Cohen, the cardiologist who administered the test, assessed diastolic dysfunction grade II.  (*Id.*) [6]

Sometime in May 2014, Dr. Patel completed a "Physical Medical Source Statement."  In that document, Dr. Patel stated that he had been treating Brown for 6 months and listed Brown's diagnoses as atrial fibrillation, cardiomyopathy, and hypertension.  (Tr. 529.)  He listed Brown's symptoms as:  shortness of breath on exertion, palpitation, nausea, dizziness, back pain, and left

---

[6] The New York Heart Association ("NYHA") functional classification system helps to categorize patients based on their symptoms of heart failure.  Class II denotes mild symptoms and slight limitations during normal activity such as ambulating two blocks or two flights of stairs.  Https://manual.jointcommission.org/releases/TJC2017B2/ DataElem0439.hmtl.

knee pain.  (*Id.*)  He characterized the knee pain as "sharp, 7/10 pain scale, exacerbated by walking," and characterized the back pain as "sharp, exacerbated by prolonged standing/sitting." (*Id.*)  The doctor opined that Brown would be as unable to sit and stand/walk for more than 2 hours during each 8-hour workday and would be able to walk only 3 city blocks without rest or severe pain.  (*Id.*)  In addition, Dr. Patel opined that Brown was unable to lift or carry any weight, twist, stoop (bend), crouch/squat, climb stairs, or climb ladders.  (Tr. 531.)  According to the doctor, Brown's symptoms would interfere with attention and concentration to such degree that he would be off task 25% or more of the workday.  (Tr. 532.)  He would also likely be absent from work more than 4 days per month as a result of his impairments or treatment.  (*Id.*) Dr. Patel stated that Brown's impairments had lasted or were expected to last at least 12 months, (Tr. 529), and he provided the May 20, 2014, echocardiogram to support his assessments, (Tr. 533).

On May 21, 2014, Brown visited the Woodhull Medical and Mental Health Center ("WMMHC").  (Tr. 573–75.)  Brown saw Sudhir Shah, M.D., an internist who was supervised by an attending physician, Victor Navarro, M.D., a cardiologist.  (Tr. 573.)  Dr. Shah noted that Brown had been seen in January 2014 but had not returned for follow-up.  (Tr. 574.)

Brown's complaints were essentially the same as those he made to Dr. Katikaneni two days earlier.  He said he had experienced palpitations daily, chest tightness the day before, and could walk only 3 blocks before experiencing shortness of breath.  (*Id.*)  Dr. Shah administered an electrocardiogram which demonstrated multiple atrial premature complexes, SV complexes

with short R-R intervals, and probable left ventricular hypertrophy.  (Tr. 571.)[7]  The doctor

assessed Brown's cardiac symptoms as "NYHA class II to III, more like II."  (Tr. 574.)[8]

On May 21, 2014, Dr. Navarro completed two questionnaires.  First, in a "Wellness Plan

Report" required for the continuation of public assistance benefits (Tr. 534–35), Dr. Navarro

diagnosed Brown with dilated cardiomyopathy, heart failure, and AFib.  (Tr. 534.)  Although the

doctor opined that Brown was "clinically improved," he opined that Brown was unable to work

for at least 12 months.  (Tr. 534–35, 540–41.)  Second, Dr. Navarro completed a "Cardiac

Medical Source Statement."  (Tr. 536–39.)  In that document, Dr. Navarro stated that he had

been treating Brown every month for three months and that Brown was NYHA Class II-III with

an "unknown" prognosis.  (Tr. 536.)  The doctor listed Brown's symptoms as chest pain;

weakness; arrhythmia; exercise intolerance; chronic fatigue; and palpitations.  (Tr. 536.)  Dr.

Navarro opined that stress increased Brown's symptoms and that he was incapable of tolerating

even "low stress" work.  (Tr. 537.)  The doctor further opined that Brown could only walk 3 city

blocks without rest or severe pain, could sit or stand/walk less than 2 hours each in an 8-hour

workday, could never lift or carry any weight, and could rarely twist, stoop, bend, crouch/squat,

or climb stairs or ladders.  (Tr. 537–38.)  In addition, Dr. Navarro estimated that Brown would be

"off task" 25% of the workday and would absent more than four times per month.  (Tr. 537,

539.)

On May 21, 2014, Dr. Olumide Osoba completed a Treating Physician's Wellness Plan

Report for the New York City Human Resources Administration's ("HRA") public assistance

program.  (Tr. 464–65.)  Dr. Osoba listed Brown's "Current Diagnoses" as: atrial fibrillation

---

[7] These terms refer to various heart irregularities.

[8] Class III denotes a marked limitation in activity due to symptoms exertion such as ambulating one block or one flight of stairs, but no symptoms at rest.  https://manual.jointcommission.org/releases/TJC2017B2/DataElem0439.html.

with onset of December 2013, cardiomyopathy with EF 35-40% with onset of December 2013, and hypertension with onset in 2012.  (Tr. 464.)  Although Dr. Osoba opined that the impairments had been resolved or stabilized, the doctor opined that Brown would be unable to work for at least 12 months.  (Tr. 465.)

On July 3, 2014, Brown returned to BHC for a hypertension follow-up.  (Tr. 633-41.)  He said he had not taken his medication for two days and was continuing to experience intermittent chest pains and palpitations on a daily basis.  (Tr. 636.)  He also reported experiencing shortness of breath when climbing one flight of stairs and walking two blocks, and claimed that, for the previous 6 months, he had been coughing for an hour a night, producing mainly phlegm.  (Tr. 636.)  Examination showed that Brown had very high blood pressure – 183/102 – and an irregular heart rhythm.  (Tr. 633.)  Although the range of motion was normal in both knees, and there was no swelling or other abnormalities, the doctor prescribed Voltaren.  (Tr. 633, 639.)

On July 21, 2014, Brown returned to WMMHC.  (Tr. 576–77.)  The medical notes for that date indicate that he had previously been referred for an automated implantable cardioverter defibrillator, but he had not followed up.  (Tr. 576.)  Brown denied chest pain or shortness of breath and said he could walk four blocks.  (*Id.*)  On examination, Brown's blood pressure was 139/75, and no cardiac arrhythmia or heart murmur was detected.  (*Id.*)  There was also no swelling in his legs.  (*Id.*)  Nonetheless, Brown was directed to return in two weeks.  (Tr. 577.)

Brown returned to WMMHC on August 4, 2014, and was examined by Dr. Berilonson S. Osiro, M.D., who was supervised by Dr. Abdul Ansari.  (Tr. 578–79.)  According to Dr. Osiro's notes, Brown was "asymptomatic," with a regular cardiac rhythm and no murmurs.  (Tr. 578.)  Brown complained that Lisinopril was causing him to cough, so Dr. Osiro substituted Losartan, another ACE inhibitor.  (Tr. 579.)

8

The Consultative Examination

On August 8, 2014, Brown went to see Ram Ravi, M.D., an internist, for a consultative examination ordered by the Social Security Administration ("SSA").  (Tr. 545–48.)  Brown told Dr. Ravi that he was currently asymptomatic and stable on his medications, and denied having chest pain, shortness of breath, dizziness, or lightheadedness.  (Tr. 545–46.)  He said his cardiologist had limited him from only bending, lifting, squatting, and other strenuous activities, but he also reported a ten-year history of low back pain and a four-year history of left knee pain. (Tr. 545.)

The examination proved largely normal, though Brown declined to perform heel and toe walking or squatting "due to his cardiac condition."  (Tr. 547.)  Lumbar X-rays and left knee X-rays showed some degree of degenerative changes.  (Tr. 550–51.)  Based on the history provided by Brown, Dr. Ravi diagnosed him with congestive heart failure, AFib, hypertension, low back pain, and left knee pain.  (Tr. 548.)  Dr. Ravi not only opined that Brown's prognosis was guarded, but stated:

> Based upon the examination, the claimant has severe limitations to all activities due to his cardiac condition.  He will require cardiac clearance.  The claimant should avoid activities requiring mild or greater exertion due to his cardiac condition.  (Tr. 548.)

Dr. Ravi also required Brown to sign a legal waiver indicating that he had been notified of his elevated blood pressure and acknowledging Dr. Ravi's recommendation that he see his cardiologist within 24 hours or present to the emergency department if his symptoms worsened. (Tr. 552.)

The State Examiner's Decision

On August 14, 2014, the State Disability Examiner denied Brown's application for SSI, finding that he was not disabled.  (Tr. 93.)  Although the SSA's own Consultative Examiner had just opined that Brown had severe limitations as to all activities and the treating physicians

9

uniformly opined that Brown could not lift or carry any weight and could not sit for more than 2

hours in an 8-hour workday, the examiner found that Brown could occasionally lift and carry 10

pounds, frequently lift and carry less than 10 pounds, and could sit for 6 hours in an 8-hour

workday.  (Tr. 90–91.)  Based on these findings, the examiner concluded that Brown was

capable of sedentary work.  (Tr. 92.)  Brown requested an ALJ hearing. (Tr. 103-06.)

<u>Medical Records for 2015</u>

Brown went to the emergency room twice in early 2015 with chest-related complaints.

On February 7, 2015, he presented at the BHC emergency department with complaints of "off

and on" chest tightness and shortness of breath since that morning.  (Tr. 644–60.)  His blood

pressure was 184/92, and he was in mild acute distress.  (Tr. 649–50.)  However, a cardiac

examination revealed a regular heart rate and rhythm and no murmur, (Tr. 650), his EKG and

chest x-rays were unremarkable, and his cardiac enzymes were negative, (Tr. 654).  The

emergency room staff recommended that he be hospitalized for observation, but Brown declined

and left against medical advice.  (Tr. 653–54.)

On April 19, 2015, Brown returned to the same emergency department with complaints

of "chest tightness" and right chest pain of three days duration that started at rest.  (Tr. 666.)  On

examination, a palpable mass in the right breast, tender to the touch, was noted.  (Tr. 665–66.)

Brown reported having moderate intermittent pain, but denied dizziness, headache, palpitations,

or shortness of breath.  (Tr. 665–66, 674.)  Brown's blood pressure was 178/76, but a cardiac

examination revealed only normal heart sounds, rate, and rhythm, with no murmurs or gallop.

(Tr. 663, 668.)  After an EKG and chest x-ray proved negative, and after his chest pain improved

with Motrin, the emergency room staff concluded that the chest pain was likely caused by

inflammation of the pleura – the membranes surrounding the lungs. (Tr. 669, 672–73.)

On August 25, 2015, Brown returned to BHC clinic in order to have some forms completed.  (Tr. 684–94.)  Brown reported that he still had intermittent chest pain, not related to exertion or relieved by rest, and shortness of breath when walking 2 blocks.  (Tr. 684.)  He admitted he was still not compliant with medications.  (*Id.*)  On examination, he had blood pressure of 139/79, and an irregular heart rhythm.  (Tr. 684, 686.)  Although he complained of left knee symptoms, an examination of the knees did not reveal any abnormal findings.  (Tr. 686.)

Brown was referred to a cardiologist, Dr. Cesar Ayala-Rodriguez, for an evaluation regarding systolic heart failure, and visited him on August 26, 2015.  (Tr. 588.)  Brown complained that he was experiencing shortness of breath after walking 2 to 3 blocks, with lightheadedness and palpitations.  (*Id.*)  Dr. Ayala-Rodriguez ordered an EKG which showed mild right and left atrial enlargement; moderate LV hypertrophy; an EF of 55-60%; mild mitral regurgitation; mild-to-moderate tricuspid regurgitation; and mild pulmonary hypertension.  (Tr. 556, 755.)  On physical examination, Brown's blood pressure was 144/90, but no cardiac abnormalities were detected aside from "a systolic ejection murmur."  (Tr. 589.)  Dr. Ayala-Rodriguez diagnosed Brown with non-ischemic cardiomyopathy, (recovered), NYHA Class II symptoms; mild non-obstructive CAD; and AFib.  (Tr. 590.)  The doctor proposed conducting further tests using a halter monitor, but Brown declined.  (*Id.*)

On the day of his examination, Dr. Ayala-Rodriguez completed a Cardiac Impairment Questionnaire.  (Tr. 558–63.)  The doctor reported the same diagnosis set forth in the preceding paragraph and identified clinical findings that supported his diagnoses: chest pain, shortness of breath, fatigue, weakness, palpitations, cough, nausea, and dizziness.  (Tr. 558–59.)  Dr. Ayala-Rodriguez opined that in an eight-hour workday, Brown could sit and stand/walk for less than one hour each; rarely/occasionally lift five pounds; and never carry any weight.  (Tr. 560.)  In

11

support of his opinion, Dr. Ayala-Rodriguez cited to various objective tests, including the December 2013 catheterization, the December 2013 echocardiogram, and the 2015 echocardiogram.  (Tr. 558.)

The doctor opined that Brown's symptoms would likely increase in a competitive work environment.  (Tr. 561.)  He believed that pain, fatigue, or other symptoms would occasionally interfere with Brown's concentration, and that he would need to take breaks every 2 hours.  (Tr. 561–62).  The doctor estimated that Brown would likely be absent more than 3 times per month as a result of his impairments or treatment, and stated that his opinions applied as far back as December 27, 2013.  (Tr. 562.)

On September 3, 2015, Brown returned to BHC after blood testing showed a sub-therapeutic international normalized ratio ("INR") – *i.e.*, that Brown was not taking enough blood-thinners to prevent a clot.  (Tr. 690–94.)  Brown admitted that he was noncompliant with his anticoagulant and stated that he had chronic exertional chest pain and occasional palpitations. (Tr. 690.)  However, he denied currently having palpitations, chest pain, or shortness of breath, and he denied having any musculoskeletal pain, swelling, or stiffness.  (Tr. 690–91.)  On examination, his blood pressure was 154/79, and he had regular cardiac rate and rhythm.  (Tr. 692.)  The BHC doctor discussed the importance of medication compliance.  (Tr. 692–93.)

Medical Records for 2016

Brown was still non-compliant when he returned to BHC on March 4, 2016, telling Dr. Tatiana Bernde C. Aime Noel, M.D. – a resident supervised by Dr. Osoba – that he had stopped taking his heart and blood pressure medications due to insurance issues that caused him to be unable to afford the medication.  (Tr. 697–99.)  However, he reported no chest pain, dyspnea, or palpitations.  (Tr. 697.)  Although his blood pressure was high – 171/91 – his heart rate was regular and there were no murmurs detected.  (Tr. 697–98.)

12

Brown returned to BHC thrice in early April 2016.  On April 7, 2016, he denied chest pain, palpitations, or shortness of breath, (Tr. 704), but claimed to have back and knee pain that made it difficult to walk.  (Tr. 704, 706.)  His blood pressure was 159/89, and he had an irregular heart rhythm.  (Tr. 706.)  He claimed to be taking his medications but admitted that he had not been able to go to the Coumadin clinic because of insurance issues.  (Tr. 704.)  The doctor advised him to participate in the Coumadin clinic and prescribed Tramadol – a narcotic used to relieve moderate to moderately severe pain – for his back.  (Tr. 706–07.)

The next day, Brown was seen at the Pharmacotherapy Clinic for an anti-coagulation counseling and therapy.  (Tr. 709–10.)  The pharmacist noted that Brown had last taken Warfarin seven months earlier.  (*Id.*)  Although Brown was assessed to be at low risk of a stroke based on his $CHA_2DS_2$-VASc score – a score which calculates the stroke risk for patients with AFib – he was re-started on the blood-thinning medication.  (Tr. 710–11.)

On April 21, 2016, Brown returned to BHC to have a disability form completed and was examined by Dr. Michael Grillo, another resident supervised by Dr. Osoba.  (Tr. 713–22.)  He reported that he was not taking Coumadin because a "prescription was never given," but was taking Tramadol to control his back pain.  (Tr. 715, 717–18.)  He specifically denied chest pains, palpitations, vomiting, dizziness, weakness, or shortness of breath, but he reported difficulty walking and climbing up and down stairs.  (Tr. 715.)  His blood pressure was 156/92 but the cardiac examination was unremarkable.  (Tr. 713, 716.)  There was crepitus in the left knee and mild tenderness in the lower back, but his muscle strength and sensation were intact.  (*Id.*)

That same day, Dr. Osoba completed a Disability Impairment Questionnaire.  (Tr. 565–69.)  Dr. Osoba diagnosed Brown with AFib, uncontrolled hypertension, congestive heart failure, and osteoarthritis.  (Tr. 564.)  In support of these diagnoses, Dr. Osoba cited the 2014 echocardiogram finding an EF of 35-40%.  (*Id.*)  The doctor described Brown's primary

13

symptoms as "palpitations, shortness of breath, fatigue, lower back pain," but noted that he also had left knee and lower back pain brought on by lifting heavy objects. (Tr. 565–66.) With respect to limitations, Dr. Osoba opined that Brown could not sit for more than 3 hours or stand/walk for more than 1 hour in an 8-hour workday. (Tr. 567.) The doctor further opined that Brown needed to get up from a seated position and move around every hour. (Tr. 567.) According to the doctor, Brown could occasionally lift up to 20 pounds, occasionally carry up to ten pounds, and frequently lift up to five pounds. (*Id.*) Dr. Osoba thought Brown's symptoms would likely increase in a competitive work environment and explained that stress could trigger AFib. (Tr. 568.) In addition, the doctor opined that Brown's symptoms could occasionally interfere with his attention and concentration, that he would need unscheduled breaks of 1 or 2 hours to rest during the day, and that Brown was likely to be absent from work 2 to 3 times per month as a result of his impairments or treatment. (Tr. 568–69.)

On May 4, 2016, Brown had an appointment with Dr. Ayala-Rodriguez, at which he reported episodic chest pain, shortness of breath after walking less than 2 blocks, and almost-daily palpitations lasting a few seconds at a time. (Tr. 586–87, 741–42, 749–50.) He claimed that he was compliant with his medications, (Tr. 586), a claim that was partially substantiated by records indicating that he had visited BHC to refill his Coumadin prescription two days earlier. (Tr. 720–22.) On examination, Dr. Ayala-Rodriguez detected a systolic ejection murmur, though Brown had a regular cardiac rhythm with no other abnormal sounds. (Tr. 587.) Dr. Ayala-Rodriguez again assessed Brown with NYHA Class II symptoms and stated that he was able to exercise. (*Id.*) Brown again refused a halter monitor. (*Id.*)

ALJ Solomon's Decision

On February 9, 2017, ALJ Solomon issued a partially favorable decision, finding that Brown was not disabled from December 25, 2013, to November 19, 2016, but was disabled from

November 20, 2016 through the date of the ALJs decision.  (Tr. 19.)  ALJ Solomon's decision

followed the familiar five-step process for making disability determinations, which the Second

Circuit has described as follows:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental
> ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the Commissioner will consider him [*per se*]
> disabled....  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform
> his past work, the Commissioner then determines whether there is
> other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d

1177, 1179–80 (2d Cir. 1998)).

At step one, the ALJ determined that Brown had not engaged in substantial gainful

activity since the alleged onset date of December 25, 2013.  (Tr. 20.)  At step two, ALJ Solomon

found that Brown had several severe impairments as of the alleged onset date: non-obstructive

CAD, atrial fibrillation, and a left knee impairment. (*Id.*)  However, the ALJ found that Brown

did not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (Tr. 20.)

At step four of the analysis, the ALJ concluded that Brown had the residual functional capacity

"RFC" to perform the full range of sedentary work as defined in 20 C.F.R. § 416.967(a).  In

reaching this conclusion, the ALJ first discounted Brown's testimony that he was unable to sit or

stand for an hour or more and experienced such shortness of breath while walking that he had to

stop every 10 to 15 minutes.  (Tr. 22.)  He found that Brown's statements concerning the

intensity, persistence, and limiting effects of his symptoms were "not fully supported" by the medical evidence. (*Id.*) However, in reviewing the medical evidence that allegedly supported his opinion, the ALJ discounted the medical opinions of each and every physician who had actually treated Brown – all of whom opined that Brown was disabled.

First, the ALJ acknowledged that Dr. Cadet, the FEDCAP internist who examined Brown in March 2014, found that Brown had "exertional limitations with lifting and walking." (Tr. 22.) However, after noting that Dr. Cadet had not quantified the limitations, the ALJ gave "little weight" to the doctor's "conclusory" opinion because it was based on a one-time examination and did not state that Brown would have such limitations for 12 months. (*Id.*)

Second, the ALJ gave "only partial weight" to Dr. Patel's physical medical source statement dated May 8, 2014, in which the doctor opined that Brown could not lift and carry any weight and could sit, stand, and walk for less than 2 hours in an 8-hour workday due to his impairments. (Tr. 23.) Although this opinion was consistent with Dr. Cadet's, the ALJ found it "significantly disproportionate to any actual physical findings, particularly as there is no condition for which the claimant is being treated that would significantly limit his ability to sit." (*Id.*) The ALJ also noted that Dr. Patel had only known the claimant for the six months "post cardio surgery, so there is [a] question of duration." (*Id.*)

Third, the ALJ gave "only little weight" to Dr. Navarro's May 21, 2014, Wellness Plan Report, in which the doctor opined that Brown was totally disabled for 12 months. (*Id.*) The ALJ characterized the report as "conclusory," noting that "functional limitations were not stated," and were unsupported by the treatment notes which did not indicate "that the claimant was totally disabled, at least until the established onset date." (*Id.*)

Fourth, the ALJ gave "only partial weight" to the opinion of Dr. Ravi, the consultative examiner who found that Brown had "severe limitations as to all activities due to his cardiac

16

condition." (Tr. 23–24.)  The ALJ noted that Dr. Ravi's opinion was "based on a one-time

examination," which was itself normal.  (Tr. 24.)  Since the doctor did not identify "specific

limitations," the ALJ found there was "no credible basis for finding the claimant would be

incapable of performing sedentary work." (*Id.*)

Fifth, the ALJ gave "little weight" to the Cardiac Impairment Questionnaire completed

by Dr. Ayala-Rodriguez on August 26, 2015, which opined that Brown could not lift and carry

any weight and could not sit, stand, and/or walk for even an hour in an 8-hour workday.  (Tr. 24.)

The ALJ stated that Dr. Ayala-Rodriguez "was not a long term treating physician at the time of

this evaluation," and that his opinion "was grossly disproportionate to any condition." (*Id.*)  In

support of the latter proposition, the ALJ stated: "Limits as to sitting less than one hour based on

his condition are so totally unsupported by any credible evidence that the entire opinion is

specious." (*Id.*)

Sixth, ALJ Solomon discounted Dr. Osoba's disability impairment questionnaire dated

April 21, 2016.  The ALJ noted that Dr. Osoba had diagnosed Brown with, among other things,

"congestive heart failure," even though there was "no diagnosis of chronic heart failure by a

cardiologist" and Dr. Osoba was "not a specialist." (*Id.*)  ALJ Solomon did not expressly state

how much weight he would give Dr. Osoba's opinion, but he stated: "The limitations stated by

Dr. Osoba are grossly disproportionate to any clinical findings and objective diagnostic testing."

(*Id.*)

After discounting the opinions of each and every physician named in the record, the ALJ

made his own assessment of the medical evidence, finding that it failed "to support the claimant's

assertion of total disability" during the period prior to November 20, 2016. (*Id.*)  ALJ Solomon

found that Brown retained "the residual functional capacity to perform sedentary work, which

requires carrying objects weighing up to 10 pounds on an occasional basis, standing and walking

up to two hours in an eight-hour workday, and sitting up to six hours in an eight-hour workday."
(Tr. 25.)  The ALJ based his assessment "on the findings from the physical examinations and the
diagnostic tests as well as the treatment notes," which he found to contain "no credible evidence
of ability to perform less than sedentary work."  (*Id.*)

With respect to step five of the five-step analysis, the ALJ found that Brown had "no past
relevant work."  (*Id.*)  He also found that prior to November 20, 2016, there were jobs in
significant numbers in the national economy that Brown could have performed, given his age,
education, work experience, and RFC.  (*Id.*)  However, on November 20, 2016, Brown's age
category changed to "an individual closely approaching advanced age."  (*Id.*)  Because of that
change, Medical-vocational Rule 201.12 dictated a finding of disabled for the period after
November 20, 2016.  (*Id.*)

The Instant Action

On February 14, 2018, the Appeals Council denied Brown's request for review, rendering
the ALJ's decision the final determination of the Commissioner.  (Tr. 1–6.)  On April 3, 2018,
Brown commenced this action, seeking review of the decision of the Commissioner of Social
Security pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).
Brown and the Commissioner now cross-move for judgment on the pleadings pursuant to Rule
12(c) of the Federal Rules of Civil Procedure.  In his Memorandum of Law in Support of
Brown's Motion for Judgment on the Pleadings ("Pl. Memo"), Brown principally argues that the
ALJ failed to properly evaluate the opinion evidence, resulting in an RFC determination that is
not based on substantial evidence.  (Pl. Memo (Doc. No. 15) at 12–21.)  Specifically, Brown
argues 1) that the Commissioner violated the "treating physician rule" by failing to give
controlling weight to the opinions of Drs. Patel, Navarro, and Osoba, and that the ALJ
substituted his own assessment of the medical evidence for that of the doctors.  (*Id.*)  The

Commissioner controverts those arguments in his Memorandum of Law in Support of the Defendant's Cross-Motion for Judgment on the Pleadings ("Def. Memo"), arguing that the ALJ properly disregarded the doctor's opinions and correctly determined that Brown has the residual functional capacity to perform sedentary work. (Def. Memo (Doc. No. 17) at 20–27.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1383(c)(3). A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). The "substantial evidence" test applies only to the Commissioner's factual determinations. Similar deference is not accorded to the

Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Ast*rue, 595 F.3d 402, 409 (2d Cir. 2010).

<u>Eligibility for SSI</u>

In order to be eligible for SSI, an individual must be blind, aged or disabled and fall within certain income and resource limits.  *See* 42 U.S.C. §§ 1381, 1382(a).  An adult individual is "considered to be disabled ... if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 1382c(a)(3)(A).  The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 1382c(a)(3)(B).  The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework set forth in 20 C.F.R. § 416.920(a)(4) and

described above.  *See* p. 15, *ante*.  "The claimant has the general burden of proving that he or she

has a disability within the meaning of the Act, *see*, *e.g.*, *Draegert v. Barnhart*, 311 F.3d at 472,

and 'bears the burden of proving his or her case at steps one through four' of the sequential five-

step framework…. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)." *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  Nonetheless, "[b]ecause a hearing on disability benefits is a

nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the

administrative record." *Id.* (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).

<u>The Treating Physician Rule</u>

"The SSA recognizes a rule of deference to the medical views of a physician who is

engaged in the primary treatment of a claimant." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir.

2015).  Under this "treating physician rule," the "opinion of a claimant's treating physician as to

the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128

(quoting 20 C.F.R. § 404.1527(d)(2)).  "'[M]edically acceptable clinical and laboratory

diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s

an essential diagnostic tool.'" *Id.* (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d

Cir. 2003)).

A physician does not qualify as a treating physician merely by virtue of having treated

the claimant.  "[T]he opinion of a treating physician is given extra weight because of his unique

position resulting from the '*continuity* of treatment he provides and the doctor/patient

*relationship* he develops.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting

*Monguer v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983)) (emphasis added in *Monguer*).  A

physician who only examines a claimant "once or twice" may not develop a physician/patient

21

relationship and, therefore, may not qualify as a "treating physician" for purposes of the rule. *Id.*
Conversely, the Second Circuit has recognized that it is possible for a physician to develop a
treating physician relationship over a period of months. *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128,
130 (2d Cir. 1999) (doctor who saw claimant three times over a six-month period was a treating
physician).

"A treating physician's statement that the claimant is disabled cannot itself be
determinative." *Green-Younger*, 335 F.3d at 106. In addition, "[t]here are … circumstances
when it is appropriate for an ALJ not to give controlling weight to a treating physician's
opinion." *Greek*, 802 F.3d at 375. "[T]he opinion of the treating physician is not afforded
controlling weight where ... the treating physician issued opinions that are not consistent with
other substantial evidence in the record, such as the opinions of other medical experts."
*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino*, 312 F.3d at 588). When a
treating physician's opinion is not given controlling weight, however, "SSA regulations require
the ALJ to consider several factors in determining how much weight the opinion should receive."
*Greek*, 802 F.3d at 375 (citing 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)–(6)). Specifically, "to
override the opinion of the treating physician, … the ALJ must explicitly consider, *inter alia*: (1)
the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence
supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence;
and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)
(*per curiam*). "After considering the above factors, the ALJ must 'comprehensively set forth
[his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at
129 (alteration in original) (quoting *Halloran*, 362 F.3d at 33). The Second Circuit has stated that
it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the
weight given to a treating physician's opinion and . . . will continue remanding when . . .

22

encounter[ing] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

"Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588.  However, [a]n ALJ must both "develop the proof" and "carefully weigh it" before deciding which medical expert to credit.  *Donato v. Sec'y of Dep't of Health & Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983).  "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Furthermore, while an ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions," *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983), an ALJ, despite having "considerable and constant exposure to medical evidence," remains a layperson.  *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000).  As such, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess*, 537 F.3d at 131 (quoting *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)).  Similarly, an ALJ cannot "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer*, 712 F.2d at 799) (brackets added in *Balsamo*).

<u>The Defects in the ALJ's Decision</u>

In this case, ALJ Solomon decision was defective in two respects.  First, he violated the treating physician rule.  Second, he substituted his own expertise or view of the medical proof for that of the doctors.

The ALJ Violated the Treating Physician Rule

In this case, ALJ Solomon violated the treating physician rule by failing to give controlling weight to the opinions of Drs. Patel, Navarro, and Osoba, all of whom opined that Brown had functional limitations which would preclude even sedentary work. (Tr. 529–33, 536–39, and 565–70). The ALJ failed to explicitly consider the factors set forth in *Selian* and failed to provide "good reasons" for giving the treating physicians' opinions little or partial weight.

To begin, the ALJ gave "only partial weight" to Dr. Patel's physical medical source statement dated May 8, 2014, in which the doctor opined that Brown could not lift and carry any weight and could sit, stand, and walk for less than two hours in an 8-hour workday due to his impairments. (Tr. 23.) The ALJ gave only two reasons for doing so. First, he implied that Dr. Patel did not qualify as a treating physician because had only known Brown for the six months "post cardio surgery." (*Id.*) Second, the ALJ found Dr. Patel's opinions "significantly disproportionate to any actual physical findings, particularly as there is no condition for which the claimant is being treated that would significantly limit his ability to sit." (*Id.*)

Neither was a good reason. The Second Circuit has held that it is possible for a physician to develop a treating physician relationship over six months. *See Snell*, 177 F.3d at 130, 133. And Dr. Patel's opinion was supported by objective evidence. The doctor not only provided the May 20, 2014, echocardiogram to support his cardiac assessments, (Tr. 533), but described Brown's other symptoms in considerable detail. Notably, he described Brown's back pain as "sharp, exacerbated by prolonged standing/sitting," (Tr. 529) – a description which could only have been drawn from taking Brown's medical history. This history was "an essential diagnostic tool" and a "medically acceptable clinical and laboratory diagnostic technique" sufficient to support the doctor's finding that Brown could only sit for 2 hours in an 8-hour workday. *See Burgess*, 537 F.3d at 128; *Green-Younger*, 335 F.3d at 107. Moreover, Dr. Patel's opinion that

24

Brown had severe limitations in his ability to sit for a prolonged period was consistent with the views of every other doctor who examined Brown.

In determining that Dr. Navarro's opinion deserved "only little weight," the ALJ considered only the Wellness Plan Report, and not the doctor's much more extensive "Cardiac Medical Source Statement." Both documents were completed on the same day – May 21, 2014 – but they were addressed to different audiences. The Wellness Plan Report, which was required to determine Brown's eligibility for public assistance, was indeed conclusory; it stated only that Brown would be totally disabled for 12 months and did not provide details regarding his functional limitations. Those details *were* included in the "Cardiac Medical Source Statement," which was geared towards the SSA's requirements. (Tr. 536–39.) In that document, Dr. Navarro, a cardiologist, stated that Brown was NYHA Class II-III with an "unknown" prognosis. (Tr. 536.) The doctor listed Brown's symptoms as chest pain; weakness; arrhythmia; exercise intolerance; chronic fatigue; and palpitations. (*Id.*) Dr. Navarro opined that stress increased Brown's symptoms, making him incapable of tolerating even "low stress" work. (Tr. 537.) The doctor further opined that Brown could only walk 3 city blocks without rest or severe pain, could sit or stand/walk less than two hours each in an 8-hour workday, could never lift or carry any weight, and could rarely twist, stoop, bend, crouch/squat, or climb stairs or ladders. (Tr. 537–38.) In addition, Dr. Navarro estimated that Brown would be "off task" 25% of the workday and would absent more than four times per month. (Tr. 537, 539.) These functional limitations, which were supported by the doctor's observations in treating Brown monthly, amply supported the view that Brown was disabled.

ALJ Solomon did not specify the weight to be given to Dr. Osoba's Disability Impairment Questionnaire dated April 21, 2016. The ALJ supplied a reason for disregarding the doctor's diagnosis of "congestive heart failure," noting that there was "no diagnosis of chronic

25

heart failure by a cardiologist" and that Dr. Osoba was "not a specialist."  (Tr. 24.)  But the ALJ did not provide a "good reason" for discounting the rest of Dr. Osoba's opinion.  Although the ALJ deemed the doctor's assessment of Brown's limitations "grossly disproportionate to any clinical findings and objective diagnostic testing," (*id*.), he did not specify the clinical findings and diagnostic tests.  In fact, Dr. Osoba pointed to the 2014 echocardiogram and symptoms that the doctor either observed or that Brown had described.  Moreover, Dr. Osoba's assessment of Brown's limitations was consistent with the assessment of each and every other doctor who examined Brown.

<u>The ALJ Substituted his Medical Opinion for the Doctors'</u>

Even if the ALJ had not violated the treating physician rule thrice over, the Court would remand this matter because the ALJ's RFC determination was wholly unsupported by any of the six doctors who treated Brown.  ALJ Solomon found that Brown retained "the residual functional capacity to perform sedentary work, which requires carrying objects weighing up to 10 pounds on an occasional basis, standing and walking up to two hours in an eight-hour workday, and sitting up to six hours in an eight-hour workday."  (Tr. 25.)  The ALJ based his assessment "on the findings from the physical examinations and the diagnostic tests as well as the treatment notes," which he – unlike the physicians who conducted the tests and wrote the notes – found to contain "no credible evidence of ability to perform less than sedentary work." (*Id.*)

In making this determination, the ALJ was not merely choosing "between properly submitted medical opinions," as he was entitled to do.  *See McBrayer*, 712 F.2d at 799 (2d Cir. 1983).  None of the physicians who treated or examined Brown supported his assessment.  Dr. Osoba opined that Brown could occasionally carry up to 10 pounds but that Brown could not sit for more than 3 hours in an 8-hour workday.  (Tr. 567.)  Dr. Patel opined that Brown was unable

26

to lift or carry any weight, (Tr. 531), and would be unable to sit for more than 2 hours during each 8-hour workday, (T. 529).  Dr. Navarro agreed with Dr. Patel, opining that Brown could never lift or carry any weight and could sit less than two hours each in an 8-hour workday.  (Tr. 537–38.)  And Dr. Ayala-Rodriguez stated that Brown could rarely/occasionally lift five pounds, could never carry any weight, and could sit for less than an hour in an eight-hour workday.  (Tr. 560.)

While the SSA's consultative examiner disagreed with the assessments of these four doctors, Dr. Ravi's assessment of Brown's RFC was even more bleak.  Dr. Ravi believed that Brown had "severe limitations to all activities due to his cardiac condition" and needed to "avoid activities requiring mild or greater exertion."  (Tr. 548.)  Indeed, Dr. Ravi was so concerned for Brown's health that the doctor demanded a legal waiver indicating that Brown had been notified of his elevated blood pressure and acknowledging Dr. Ravi's recommendation that he see his cardiologist within 24 hours or present to the emergency department if his symptoms worsened. (Tr. 552.)

In sum, not one of the doctors who actually examined Brown believed that he was capable of even sedentary work at the various times they examined him in 2014, 2015, and 2016. In finding that Brown could perform such work from the alleged onset date of December 25, 2013, until November 19, 2016, ALJ Solomon was relying on his own assessment of the medical evidence, or perhaps the assessment of his fellow layman – the State Examiner.  Even though the ALJ and State Examiner were likely very experienced in reviewing medical evidence, neither was permitted to substitute his own expertise or view of the medical proof against the uniform view of the doctors.  *See Burgess*, 537 F.3d at 131; *Shaw*, 221 F.3d at 134; *Balsamo*, 142 F.3d at 81; *McBrayer*, 712 F.2d at 799.

**CONCLUSION**

27

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Brown's motion for judgment on the pleadings is granted to the extent it seeks remand.  This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      May 28, 2020

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge

28